UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| DAVID HART, *by and through his*<br>*Power of Attorney*, DALONA DILLON, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:20-CV-147-REW-CJS |
| | ) | |
| v. | ) | OPINION AND ORDER |
| | ) | |
| MIKE LAWSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

On July 24, 2019, Dalona Dillon reported her father, Plaintiff David Hart, missing.[1] *See* DE 1 ¶¶ 11, 19 (Complaint). Unbeknownst to Dillon at the time, Hart, in his 60s and alleged to suffer from Alzheimer's, drove the truck to his doctor's office and then to a restaurant in Corbin, Kentucky. *Id.* ¶¶ 11-12. A restaurant employee called Whitley County Dispatch, claiming that "Hart had obtained less than $10.00 in food and was unable to pay for it." *Id.* ¶ 13.

Defendant Ron Bowling, a Whitley County Constable, responded to the call and observed Hart's truck in the parking lot, identifying it "as belonging to the subject who failed to pay for food[.]" *Id.* ¶ 14. Whitley Deputy Mike Lawson already was en route, but detoured to tend to an accident. *See* DE 119 at 13:14-20 (M. Lawson Dep.). Driving his personal vehicle, Constable Bowling (who perceived Hart to be speeding) followed Hart out of the restaurant's lot and alerted Deputy Lawson that Hart was headed toward Lawson's wreck site. *See* DE 1 ¶¶ 15-16. Lawson "was working a non-injury motor vehicle accident at the intersection of McKeehan Crossing and S 25 W[.]" *Id.* ¶ 16. Traffic was stopped at the site, and Hart ended up stopped in a line of vehicles.

---

[1] Hart "suffers from a neurocognitive disorder/dementia and hearing impairment" and Dillon "serves as his power of attorney and emergency fiduciary." DE 1 ¶ 4.

*See id.*; DE 119 at 17:4-20, 18:21-24.  Identifying Hart in the line, Deputy Lawson directed Hart "to put his vehicle in park" and "approached . . . Hart with his gun drawn."  DE 1 ¶ 17.  When Hart instead fled, Lawson fired his gun three times, striking and eventually flattening Hart's rear tire. *See id.* ¶ 18; DE 119 at 3019-23.

Lawson and Bowling (who had been stopped behind Hart) then pursued or followed.  *See* DE 1 ¶ 20; 118 at 34:1-24 (R. Bowling Dep.); 119 at 34:1-19.  Hart had turned around in a business lot down the road and was headed back toward Lawson.  *See* DE 119 at 34:14-22.  Lawson intentionally drove into Hart's oncoming lane to precipitate either Hart stopping or a direct collision between the cars.  *See id.* at 34:23-25.  Instead, Hart turned onto a different road, which ultimately dead-ended in a grass plot in front of a business.  *See* DE 1 ¶ 20; 119 at 35:7-8.

Both Lawson and Bowling pursued Hart until he came to a stop in the field near Muddy Boy Records Karaoke Place ("Muddy Boy").  *See* DE 1 ¶ 20.  Lawson again approached Hart with his gun drawn.  *See id.* ¶ 21.  Hart attempted to drive away again; his truck, though, "spun out" or went into a donut and struck Lawson's cruiser on two occasions.  *Id.*  Lawson, as Hart drove, fired again at Hart's truck, and the truck eventually stopped only when it plowed into Lawson's cruiser from the side.  *See id.* ¶ 22.  Lawson and Bowling forcibly removed Hart from his truck and placed him on the ground.  *See id.* ¶ 23.  They had difficulty securing Hart's hands, and a physical altercation ensued.  *See id.*  Eventually, Lawson and Bowling, with the help of a bystander, handcuffed Hart and waited for police and an ambulance to arrive.  *See* DE 118 at 98:1-3. Bowling placed Hart chest down across Lawson's black cruiser, with his hands cuffed in the rear and Hart's pants down, for over twenty minutes.  *See* DE 123-9 at 16:07:10-16:27:45 (Muddy Boy Video).  Hart received medical treatment at University of Kentucky Medical Center before being booked into and held at the Whitley County Detention Center ("WCDC").  *See* DE 1 ¶ 23.

In connection with the July 24, 2019 events, Hart was charged with two counts of wanton endangerment, one count of fleeing or evading police, one count of criminal mischief, one count of resisting arrest, and one count of theft by unlawful taking. *See* DE 127-3 (Indictment); 123-8 at 1 (Guilty Plea). After he was discharged from University of Kentucky Medical Center, Hart was transported to WCDC to be housed in anticipation of trial. *See* DE 1 ¶ 24; *see also* DE 115-3 (UK Healthcare Discharge Summary). There he sat for two years.

Hart alleges that, while at WCDC, medical and jail staff illegally refused to administer his prescription medications, specifically gabapentin and Xanax.[2] *See* DE 1 ¶¶ 25-28. In August 2021, Hart was released from WCDC after he pleaded guilty to both wanton endangerment counts and the resisting arrest count. *See* DE 123-8 at 3-4. The remaining counts were dismissed. *See id.* Hart received a probated term for his crimes.

On July 9, 2020, Hart filed the instant complaint, raising various § 1983 and state law claims against Deputy Lawson, Constable Bowling, Whitley County Sheriff Todd Shelley, Whitley County jailer Brian Lawson, Rojetta Bowling, LNP ("Nurse Bowling"), and the Nurse's employer, Southern Health Partners, Inc ("SHP").[3] *See* DE 1. Currently before the Court are Defendants' motions for summary judgment. *See* DE 113; 115; 123; 127. Hart responded to each in opposition, *see* DE 136; 137; 138; 139, and Defendants replied, *see* DE 140; 142; 144; 146. The matter is exhaustively briefed and ripe for this Court's review and decision.

---

[2] The Complaint also references Neurontin and Alprazolam. Neurontin is a brand name for gabapentin and alprazolam is the generic for Xanax.

[3] The Court (Judge Hood, at the time) previously dismissed Hart's state law claims and federal excessive force claim against Constable Bowling in his official capacity and Hart's negligence, gross negligence, and battery claims against Constable Bowling in his individual capacities. *See* DE 33 at 10.

## I.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In determining whether a genuine dispute exists, the Court considers all facts and draws all inferences in the light most favorable to the non-moving party.  *See Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).  Further, the Court may not "weigh evidence [or] determine the truth of the matter[.]"  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986).  If the moving party satisfies its burden, the burden then shifts to the non-moving party to produce "specific facts" showing a "genuine issue" for trial.  *Id.*  "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial."  *Id.* at 2552.

A fact is "material" if the underlying substantive law identifies the fact as critical.  *See Anderson*, 106 S. Ct. at 2510.  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  An issue is "genuine" is "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 2511 (citing *First Nat'l Bank of Az. v. Cities Servs. Co.*, 88 S. Ct. 1575, 1592 (1968)).  Such evidence must be suitable for admission into evidence at trial.  *See Salt Lick Bancorp v. FDIC*, 187 Fed. App'x 428, 444-45 (6th Cir. 2006).

The Court has grappled with this difficult case.  Ultimately, there is no triable issue as to the claims against the Jailer, SHP, and Nurse Bowling.  Whatever the jail's de facto policy may have been in Bowling's or the jailer's minds, the fact is that non-party APRN Baker made an express medical decision not to treat Hart with gabapentin or Xanax.  She alone had the prescribing authority, and her medical judgment ends the matter against the Jailer, SHP (which was not her employer), and the subordinate LPN Bowling.

A jury must sort the disputed facts as to the Constable and the Deputy.  *Heck v. Humphrey* eliminates some but not all of Hart's case.  The record as presented does not allow the Court to discern the precise event wrapped into each of the wanton endangerment convictions. No party tendered the pleas' factual basis, and the indictment and judgment are indeterminate.  The resisting arrest conviction precludes an action centering on the arrest itself, but the case involves much more than just the arrest force used.  Lawson employed deadly force **three times** against Hart.  The record, viewed in Hart's favor, supports the conclusion that none of those acts was proper under the Fourth Amendment.  Further, Constable Bowling, post-arrest, fixed Hart onto the hood of Lawson's black cruiser, on a hot July afternoon; he left Hart splayed face down across the hood for over twenty minutes, cuffed behind his back and with his pants at his feet.  A jury must decide if this was unreasonable force against a person, post-arrest.  The state law claims against the Constable and Deputy also largely survive the motion, except where otherwise stated.

## II. Analysis

### a. Nurse Bowling and SHP's Motion for Summary Judgment

Nurse Bowling and SHP move for summary judgment on Hart's § 1983 failure to provide adequate medical care claim.  *See* DE 113 (Motion); 113-1 at 1 (Memorandum in Support).

Whitley County contracted SHP to provide WCDC detainees medical care.[4]  *See* 113-2 (Health Services Agreement).  Accordingly, SHP employed nurses at WCDC, including Nurse Bowling.  *See* DE 1 ¶¶ 9-10.  The parties do not dispute that SHP and Nurse Bowling stand in the shoes of the state for purposes of potential § 1983 liability.  *See, e.g.*, *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) ("The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983."); *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015) ("Our court has held that private corporations performing traditional state functions, such as the provision of medical services to prison inmates, act under color of state law for purposes of § 1983.").  Hart claims that Bowling and SHP deprived him of adequate medical care by declining to administer to him prescribed gabapentin and Xanax.  *See* DE 1 ¶¶ 25-28.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 108 S. Ct. 2250, 2254-55 (1988).  "[T]he Fourteenth Amendment's Due Process Clause affords pretrial detainees a right to adequate medical treatment[.]"  *Harbin v. City of Detroit*, 147 F. App'x 566, 569 (6th Cir. 2005).  This right is violated when medical professionals "are deliberately indifferent to the [detainee's] serious medical needs."  *Comstock v. McCray*, 273 F.3d 693, 703 (6th Cir. 2001).  "Intentional deprivation of prescription medication may arise to the level of an Eighth Amendment violation."  *Rigney v. Marcum*, No.7-CV-187-REW, 2007 WL 2979931, at *13 (E.D. Ky. Oct. 11, 2007).

"To survive summary judgment on a deliberate indifference claim, a plaintiff must 'present evidence from which a reasonable jury could find that . . . the defendant's action (or lack of action)

---

[4] The contract was in effect while Hart was at WCDC.  *See* DE 113-2; 113-3 (Amendment to Health Services Agreement).

was intentional (not accidental), and she either (a) acted intentionally to ignore the detainee's serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to' the detainee." *Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022) (alterations adopted) (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 597 (6th Cir. 2021)); *see also Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 317 (6th Cir. 2023) (quoting *Brawner*, 14 F.4th at 596) ("Accordingly, plaintiff must show . . . that each defendant 'acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." (internal quotation marks omitted)).

For many years, courts used the same rubric to decide Eighth Amendment and Fourteenth Amendment deliberate indifference claims. *See, e.g., Richko v. Wayne Cnty.*, 819 F.3d 907, 915–16 (6th Cir. 2016); *Richmond v. Huq*, 885   F.3d 928, 938 (6th Cir. 2018).   Under this rubric, the plaintiff must establish "that the medical need at issue is 'sufficiently serious,'"; this has been labeled the "objective component" of the test. *Huq*, 885 F.3d at 938 (quoting *Farmer v. Brennan*, 114 S. Ct. 1970, 1977 (1994)).  Second, the plaintiff typically is required to show "that the 'official knew of and disregarded an excessive risk to inmate health or safety,'" *i.e.*, the subjective prong. *Id.* at 939 (quoting *Farme*r, 144 S. Ct. at 1979) (alterations adopted).  This rubric is still used to evaluate Eighth Amendment deliberate indifference claims under § 1983. *See, e.g.*, *Phillips v. Tangilag*, 14 F.4th 524, 534–35 (6th Cir. 2021).

However, following *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Sixth Circuit altered the second prong of the traditional rubric in *Brawner v. Scott County*, 14 F.4th 585, 596 (6th Cir. 2021) for pretrial detainees' deliberate indifference claims.  In *Kingsley*, the Court analyzed the standard applicable to detainees' excessive force claims and replaced the traditional subjective state-of-mind prong with an objective inquiry.  *See Kingsley*, 135 S. Ct. at 2472–73.

But the *Kingsley* Court instructed that a court "cannot apply [the objective] standard mechanically" and that "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 2473 (quoting *Graham v. Connor*, 109 S. Ct. 1865, 1872 (1989)).   The Court further instructed that courts "must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id*.   However, the Court did not extend the *Kingsley* holding beyond the excessive force context. *See id.*

In *Brawner*, the Sixth Circuit extended *Kingsley*'s reasoning to deliberate indifference cases alleging inadequate medical care. *See Brawner*, 14 F.4th at 596; *Greene*, 22 F.4th at 607 (establishing that *Brawner*'s extension of *Kingsley* to deliberate indifference claims was controlling law rather than "mere dictum").   However, *Brawner* "stopped short of fully eliminating the subjective inquiry" of the second prong of the traditional deliberate indifference test and, instead, modified the inquiry.   *See Greene*, 22 F.4th at 606 (finding that "*Brawner* modified the second prong of the deliberate indifference test applied to pretrial detainees").   The *Brawner* court determined that, even importing an objective test, "mere negligence is insufficient" to establish deliberate indifference.   *Brawner*, 14 F.4th at 596.   Instead, it imported the civil recklessness standard articulated, but rejected, in *Farmer* and found that "[a] defendant must have not only acted deliberately (not accidentally), but also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id*. (quoting *Farmer*, 114 S. Ct. at 1978).   Put differently, to succeed on a deliberate indifference claim, "[a] pretrial detainee must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (collecting cases) (internal quotation marks omitted); *see Helphenstine*, 60 F.4th at 316 (overruling finding in *Trozzi v. Lake County*, 29 F.4th 745, 751 (6th Cir. 2022), that *Brawner*

requires "consideration of an official's actual knowledge of the relevant circumstances"). "[B]ecause [the Court] cannot 'impute knowledge from one defendant to another,' [it] must 'evaluate each defendant individually.'" *Greene*, 22 F.4th at 607 (quoting *Speers v. Cnty. of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)). Further, the deliberate indifference inquiry is "very fact specific." *Hammonds v. Theakston*, 833 F. App'x 295, 299 (11th Cir. 2020).

Here, Defendants do not argue that Hart's medical needs were not sufficiently serious.[5] *See* DE 113-1 at 2. Rather, the parties dispute the second element. *See* DE 113-1 at 6.

      *i.   Nurse Bowling*

The record lacks evidence that Nurse Bowling was deliberately indifferent toward Hart's medical needs. First, Hart advances no facts indicating that Bowling was or should have been aware of any alleged withdrawal from the prescribed drugs. True, Bowling was aware that Hart had valid Xanax and gabapentin prescriptions, which APRN Bennett-Baker declined to administer. *See* DE 133 at 14, 15:2-10, 17:18-23 (R. Bowling Dep.); *see also* DE 115-11 (Beech Tree Manor Medication List); 115-12 at 2 (Continuity of Care Document) (listing prescriptions for gabapentin and Xanax). But alone, Bowling's awareness of the discontinued medication neither establishes "facts from which to infer substantial risk" to Hart nor that Bowling should have or "did in fact draw the inference" that a substantial risk existed. *Comstock*, 273 F.3d 703. Bowling stated—and Hart concedes—that "Hart never complained" about his gabapentin and Xanax being discontinued. DE 133 at 18:16-22; DE 117 at 78:10-15 (D. Hart Dep.) (answering "no" when asked if he ever asked Nurse Bowling for Xanax or gabapentin). At WCDC, Bowling treated Hart at least five times. *See* DE 115-10; 115-13; 115-14; 115-16; 115-20. Records from these interactions make no indication of withdrawal symptoms. *See, e.g.*, DE 115-16 (indicating that Hart had a swollen hand

---

[5] While Bowling and SHP do not contest that Hart's medical need for gabapentin and Xanax is sufficiently serious, Jailer Lawson does. *See* DE 115-1. The Court addresses that issue below.

and bruising after allegedly being pushed against a wall).  Bowling was aware that withdrawal from long-term Xanax use could prompt consequences, but she saw no signs from Hart.  *See* DE 133 at 18.

Indeed, the only evidence that Hart experienced withdrawal symptoms at WCDC comes from Hart's proffered expert, Jill Baldwin, APRN.  *See* DE 73 (Expert Disclosure); DE 113-4 (J. Baldwin Dep.). Based on a review of Dillon's deposition, *see* DE 132 at 18:9-18, Baldwin opines that Hart *may* have experienced withdrawal:

> On page 17 of his daughter's deposition, she talks about having contact with him at the jail through the telephone.  And she says, at this point, that he is confused, he is rambling.  And that would have been six·days after he had arrived at the jail that she was not able to understand him.  And so, she states that in her deposition, so that would have been within the withdrawal period of both Xanax and gabapentin.

DE 113-4 at 18:11-18.  This, by itself, is insufficient to create a triable issue.  As an initial point, Baldwin's opinion is based on Dillon's deposition rather than first-hand medical observations or a review of the medical records.  Indeed, Dillon's deposition is the only evidence that Baldwin cites in support of her opinion.  *See id.* at 18:6-19.  Further, Baldwin admits that, to her knowledge, the only symptom of withdrawal that Hart exhibited was confusion (relayed through Dillon), and that confusion is also consistent with someone who suffers from dementia.  *See id.* at 18:19-22, 20:19-25, 21:1-16.  Plainly, Hart had confusion on the day in question and well prior.

To the extent that confusion signals withdrawal, nothing indicates that Bowling was aware of such indicia or independently noticed that Hart appeared confused.  *See* DE 133 at 11:2-5 ("[Hart] was always polite. He would come to the door to get his medication. He was smiling. He always said thank you. That's about all I recall [about him].").  While Dillon communicated with WCDC staff, including Bowling, the extent of those conversations concerned WCDC's policy regarding administering controlled substances, not confusion symptoms.  *See id.* at 18:5-15

(recalling that Dillon called "numerous times about the medications"); 116 at 74:19-25, 75:1-14 (D. Dillon Dep.) (stating that she called WCDC and asked about Hart's medication).

Finally, and most critically, Hart fails to demonstrate that Bowling acted to deny medication. Bowling, as an LPN, lacks authority to prescribe medication. *See* DE 133 at 14:16-18 ("I'm not able to write prescriptions[.]"). APRN Bennett-Baker—a non-party and independent contractor of SHP[6]—testified that, after examining Hart, she, based on her view of the medical need, decided to discontinue the Xanax and gabapentin. DE 134 at 59:15-22, 60:20-25, 61:1-2 (K. Bennett-Baker Dep.). Indeed, Baldwin is critical of *Bennett-Baker's* (and only her) decision to discontinue the medication rather than Bowling's care in conformity with that decision. *See* DE 113-4 at 17:22-24, 18:2-5. Baldwin testified that a doctor, nurse practitioner, or physician's assistant is responsible for deciding whether to prescribe medications. *See id.* at 14:19-23. She agreed that an LPN or RN, like Bowling, cannot prescribe Xanax or gabapentin. *See id.* at 24:4-7.

In short, given the lack of supporting evidence, the Court **GRANTS** summary judgment as to the § 1983 claim against Nurse Bowling. The Court notes that Bowling expressly testified that she made Bennett Baker aware of the prescriptions, so nothing suggests a triable issue as to Bowling's § 1983 liability.

    *ii.*   *SHP*

"A private entity, such as [SHP], that contracts to provide medical services at a jail can be held liable under § 1983 because it is carrying out a traditional state function." *See Winkler*, 893 F.3d at 904; *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005). However, "[l]ike a municipality,

---

[6] Hart does not argue that SHP is vicariously liable for the conduct of Bennett-Baker. In any event, a "principal . . . generally is not held liable for the conduct of an independent contractor." *Nazar v. Branham*, 291 S.W.3d 599, 606 (Ky. 2009) (citing *Williams v. Ky. Dept. of Ed.*, 113 S.W.3d 145, 151 (Ky. 2003)). Hart does not advocate any exception to this postulate.

[SHP] cannot be held liable on a respondeat superior theory[;]" instead, a plaintiff must identify "a policy or custom" that caused the constitutional violation. *Winkler*, 893 F.3d at 904 (quoting *Johnson*, 398 F.3d at 877); *Grose v. Corr. Med. Servs., Inc.*, 400 F. App'x 986, 989 (6th Cir. 2010). "To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015).

Here, Hart argues that SHP "had a policy or custom of not providing medications that were considered controlled substances." DE 138 at 15. As an initial point, to the extent that the argument references WCDC's written policy, that policy does not prohibit SHP employees from administering controlled substances. *See* DE 115-8 (Medical Services Policy); *see also* DE 134 at 39:8-9 (Baker testifying that she is "not aware of any policy" at WCDC prohibiting medical professionals from administering controlled substances); 133 at 13:23-14, 14:1-8 (testifying that "it's a jail policy that [controlled substances] are not" prescribed, but that she has "never seen that in a written policy"). Hart fails to identify any other formal policy prohibiting staff from administering controlled substances. The truth, on the record, is that SHP's APRN believed she could prescribe the meds (which squared with the Jail's written policy) and she simply made the medical choice to discontinue them. Again, Bennett-Baker is not a party to this lawsuit, and SHP did not have a policy that blocked the script from issuing.[7]

---

[7] In the briefing, Plaintiff tries to insert a claim regarding withholding of pain medication, in particular, Percocet. The Complaint only concerns the gabapentin and Xanax scripts, *see* DE 1 ¶¶ 26-27, 40-41, and the Court rejects any effort to enlarge the claims via summary judgment briefing. In any event, APRN Baker said she had the freedom to prescribe needed medications. *See* DE 134 at 48:9-14 ("Severe pain, if someone is having a cancer type issue that's very painful, someone may have had surgery then, yes, I have ordered controlled medicines before."); *see id.* at 62: 12-18 ("[I]f someone is having pain, if someone is having a mental health issue, I address it immediately and I address it

Construing Hart's theory to be that SHP had a custom of declining to administer controlled substances, he must show: (1) "'a clear and persistent' pattern of unconstitutional conduct by [SHP] employees;" (2) SHP's "'notice or constructive notice' of the unconstitutional conduct;" (3) SHP's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction;" and (4) "that the policy of inaction was the 'moving force' of the constitutional deprivation[.]"  *D'Ambrosio v. Marino*, 747 F.3d 378, 387-88 (6th Cir. 2014) (internal quotation marks omitted) (second and third alterations in original).

Here, Hart presents no evidence as to the first element.  To be sure, Bennett-Baker—a non-party independent contractor—testified that she "typically do[es not] prescribe" controlled substances due to risk of dependence and overdose.  *See*  DE 134 at 39:14-19; *see also* DE 133 at 13:19-25, 14:1-8.  Even accepting that WCDC itself had an unwritten custom of not administrating controlled substances, the record lacks evidence of any prior instances—let alone a "clear and persistent" pattern—of SHP declining to administer controlled substances when it knew or should have known that the conduct presented an unjustifiably high risk of harm.  Indeed, Bennett-Baker's explanation for not typically prescribing controlled substances is to mitigate risks associated with the drugs.  Bennett-Baker also testified that if a patient experienced withdrawal symptoms, she was permitted to—and in fact would—appropriately taper that patient.  *See* DE 134 at 46:5-25.  She did not deem a taper necessary in Hart's case, and she saw no justification for the scripts.  *See id.* at 39:8-24 ("[W]hen I was notified of the medicines that Mr. Hart was on, I made the clinical decision that neither of these meds were clinically indicated. Mr. Hart was not dependent on these meds because he exhibited no symptoms of withdrawal from . . . either one.").  On this record, a

---

thoroughly. But I don't immediately jump to a controlled substance to try to fix their issue but then again, I don't do that in private practice either. The controlled substances are used as a last resort.").

reasonable fact finder could not conclude that SHP has liability under the § 1983 standards.  The Court **GRANTS** summary judgment on the § 1983 claim against SHP.

### b.  Jailer Lawson's Motion for Summary Judgment

Jailer Lawson seeks summary judgment, arguing that he is entitled to qualified immunity on the § 1983 deliberate indifference claim against him in his individual capacity.  *See* DE 115; 115-1 (Memorandum in Support).  He also resists any official capacity claim.

Qualified immunity extends to government officials sued in their individual capacities.  *See Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982).  It shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known."  *Id*.  To determine whether a defendant is entitled to qualified immunity, the Court must consider: "(1) whether the facts taken in the light most favorable to plaintiff could establish a constitutional violation; (2) whether the right was a 'clearly established' right of which any reasonable officer would have known; and (3) whether the official's actions were objectively unreasonable in light of that clearly established right."  *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002) (citing *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999)).  The defendant bears the initial burden of demonstrating that he is entitled to qualified immunity.  *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).  "Thereafter, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct."  *Id.*  "Although the application of qualified immunity comprises a legal issue, summary judgment is inappropriate when conflicting evidence creates subordinate predicate factual questions which must be resolved by a fact finder at trial."

*Hamilton v. Myers*, 281 F.3d 520, 531 (6th Cir. 2002) (citing *Anderson v. Creighton*, 483 107 S. Ct. 3034, 3040 (1987)).

Lawson first argues that Hart cannot establish a constitutional violation.  *See* DE 115-1 at 9-13.  As outlined above, the right to medical treatment is violated when medical professionals "are deliberately indifferent to the [detainee's] serious medical needs."  *Comstock*, 273 F.3d at 703. Lawson avers that there is no evidence (1) that "Hart had an objectively serious need for Xanax and gabapentin[,]" or (2) that "Lawson recklessly denied the medications despite an unjustifiably high risk of harm[.]"  DE 115-1 at 9, 12.

"The objective component of the test requires the existence of a sufficiently serious medical need [, which] is predicated upon the inmate demonstrating that he or she is incarcerated under conditions imposing a substantial risk of serious harm."  *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (internal quotation marks and citations omitted).  "A medical condition is sufficiently serious when a doctor has diagnosed a need for treatment or when the need for medical care would be obvious to a lay person."  *Ramsey v. Haney*, 5:15-CV-117-DCR-REW, at *4 (E.D. Ky. Feb. 5, 2016) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).  Here, physicians had prescribed Hart gabapentin and Xanax prior to his arrival at WCDC.  *See* DE 115-11 (Beech Tree Manor Medication List); 115-12 at 2 (Continuity of Care Document) (listing prescriptions for gabapentin and Xanax).  Likewise, Hart's PCP had prescribed harmoniously, and UK Hospital indicated a continuing prescription upon his pre-detention discharge.  Safe to say, when Hart entered the jail, his status reflected an active and valid prescription for these drugs, dating at least back to June of 2019.  This would be enough to create a fact question on extant need, at least at the point of UK discharge.

However, within days of jail intake, APRN Bennett-Baker assessed Hart and concluded that those prescriptions were not appropriate. *See* DE 134 at 39:19-24; *see also Harrison*, 539 F.3d at 518 ("A serious medical need is one that has been diagnosed by a physician as mandating treatment[.]"). Bennett-Baker explained that she halted the medications, rather than tapering, because she did not perceive justificatory neuropathy or anxiety and she saw no signs of dependency or withdrawal symptoms. *See* DE 134 at 39:22-25, 40:1-6, 41:18-24.

Further, as discussed above, medical records confirm that Hart never requested the medication or otherwise presented a need for it. *See, e.g.*, DE 115-10; 115-13; 115-14; 115-15; 115-16; 115-20; 132. WCDC policy stated that inmates could seek medical care by completing a sick call slip. *See* DE 115-8 at 4-5. Hart completed two sick call slips at WCDC. *See* DE 115-21; 115-22. However, those related to stomach pain, sinus issues, and coughing. *See* DE 115-21; 115-22. Moreover, patient clinical data forms from August 31, 2019 and April 21, 2020 indicate that Hart did not complain of—and medical providers did not observe—symptoms of withdrawal (*i.e.*, confusion, agitation, nausea, fever, difficulty breathing, pain, headache). *See* DE 115-15 (Patient Clinic Data Form); *see also* DE 132 at 22:2-8 (describing anxiety, agitation, seizures, tremors autonomic instability as potential symptoms of withdrawal); DE 115-8 (defining drug withdrawal as a medical emergency and noting that "[a]ll officers are trained to respond to medical emergencies"). Nor does Hart present "verifying medical evidence in the record to establish [a] detrimental effect" of WCDC denying him gabapentin and Xanax. *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001); *see* DE 113-4 at 21:17-22 (APRN Baldwin acknowledging that after "being taken off [gabapentin and Xanax,]" Hart "did not have consequences that resulted [in] him being transferred to the emergency department").

True, Baldwin had criticism of Bennett-Baker's process and decisions; that practitioner is not a defendant in this case.  Further, Baldwin had a worry about withdrawal, but she nowhere gives an opinion, within a reasonable degree of medical probability, that Hart actually demonstrated withdrawal.  Further, and critically for Jailer Lawson, there is no evidence to show that Lawson, aware of the risk or of the presentation of withdrawal, denied Hart care.  Indeed, Bennett-Baker treated Hart, and Bennett-Baker testified without opposition that she could have prescribed the meds, would have done so if needed (tapering included, for any perceived withdrawal), and simply deemed them medically unnecessary.  Jailer Lawson is entitled to rely on the expertise of qualified medical personnel.  *See Grote v. Kenton Cnty.*, 85 F.4th 397, 412 (6th Cir. 2023) ("Generally, 'non-medically trained officer[s]' do not act with deliberate indifference to a detainee's medical needs when they reasonably defer to a medical professional's diagnosis or treatment." (alteration in original) (quoting *McGaw v. Sevier Cnty.*, 715 F. App'x 495, 498 (6th Cir. 2017))).  If the prescriber had the power to continue the meds and she reached a medical decision to discontinue them, Jailer Lawson had no role in, or liability for, the election.

On these facts, Hart fails to establish a triable issue concerning Jailer Lawson, in his individual capacity.  The Court thus **GRANTS** summary judgment regarding the § 1983 individual capacity claim.

Lawson also seeks summary judgment on the § 1983 claim against him in his official capacity as WCDC jailer.  *See* DE 115-1 at 15.  Hart agrees that summary judgment on the official capacity claim is appropriate.  The Court **GRANTS** summary judgment on that claim.

### c. Constable Bowling's Motion for Summary Judgment

Next, Constable Bowling moves for summary judgment on Hart's individual capacity § 1983 and state law claims.[8]   *See* DE 123; 123-1 (Memorandum in Support).  Hart responded in opposition, *see* DE 136, and Bowling replied, *see* DE 144.

### i. Section 1983 Claim

Bowling first argues that Hart's § 1983 claim is barred under *Heck v. Humphrey*, 114 S. Ct. 2364 (1994).[9]  *Heck* precludes a plaintiff from raising a § 1983 claim if "judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence[.]"[10]  *Heck*, 114 S. Ct. at 2372.  But "if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit."  *Id.* at 2372-73 (footnote omitted).  The Sixth Circuit, in a case of this type, has stated that *Heck* operates to bar a § 1983 claim in two circumstances:

> The first is when the criminal provision makes the lack of excessive force . . . an element of the crime. The second is when excessive force . . . is an affirmative defense to the crime[.] In each of these circumstances, the § 1983 suit would seek[] a determination of a fact that, if true, would have precluded the conviction.

---

[8] Hart initially filed: (1) an excessive force claim against Bowling in his individual and official capacities, and (2) various state law claims against Constable Bowling in both his official and individual capacities.  *See* DE 1 ¶¶ 29-35, 42-52.  Bowling filed a partial motion to dismiss.  *See* DE 17.  The Court dismissed Hart's state law claims and excessive force claim against Bowling in his official capacity, as well as the state law claims of negligence, gross negligence, and battery against Bowling in his individual capacity.  *See* DE 33 at 10.

[9] Hart, citing *Gonzalez v. Lusardi*, 930 F. Supp. 2d 840 (E.D. Ky. 2013), and *Donovan v. Thames*, 105 F.3d 291 (6th Cir. 1997), claims that *Heck* is inapplicable to § 1983 actions.  *See* DE 136 at 13.  He misconstrues both cases.  The *Gonzalez* court, applying *Heck*, determined that the plaintiff's prior convictions did not preclude a § 1983 claim because the lack of excessive force was not an element to the underlying convictions.  *See Gonzalez*, 930 F. Supp. 2d at 852.  Similarly, in *Donovan*, the Sixth Circuit stated that "[b]ecause the issue of the officers' use of excessive force was not essential to the conviction for resisting arrest . . . we hold based on Kentucky law that issue preclusion does not restrict Donovan's excessive force claim in federal court."  *Donovan*, 105 F. 3d at 296; *see also id.* at 298 n.8 ("The Supreme Court has noted that a conviction for the crime of resisting arrest, where 'defined as intentionally preventing a peace officer from effecting a lawful arrest,' would preclude a subsequent suit under § 1983" (citing *Heck*, 114 S. Ct. at 2373 n.6)).  *Heck* clearly extends to § 1983 excessive force claims, even if it may not ultimately bar a plaintiff from bringing such a claim in a particular case.

[10] This is true "unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated" by executive order, reversal on direct appeal, or writ of habeas corpus.  *Heck*, 114 S. Ct. at 2372.  Hart does not argue that his convictions were invalidated.

Therefore, in this Circuit, if a plaintiff asserts a claim that contradicts an element of an underlying criminal offense, or if that claim could have been asserted in criminal court as an affirmative defense, *Heck* applies to bar the § 1983 suit.

*Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 608-09 (6th Cir. 2014) (third alteration in original) (internal citations and quotation marks omitted).

Here, relative to the date in question, Hart pleaded "guilty but mentally ill"[11] to two counts of wanton endangerment and one count of resisting arrest. *See* DE 123-8 at 1. "A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." KY. REV. STAT. ANN. § 508.060(1). At to resisting arrest, in Kentucky:

A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a peace officer, recognized to be acting under color of his official authority, from effecting an arrest of the actor or another by:
(a) Using or threatening to use physical force or violence against the peace officer or another; or
(b) Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

*Id.* § 520.090(1).

The Sixth Circuit recognizes that, under Kentucky law, conduct that satisfies the elements of wanton endangerment would authorize the use of deadly force at the time of the crime. Also, a resisting arrest conviction scotches a claim for over the propriety of force used to arrest. *Phillips v. Curtis*, 765 F. App'x 130, 132 (6th Cir. 2019) (referencing, under Kentucky law, interaction of wanton endangerment and deadly force, under *Heck*: "To be sure, if the two incidents happened at roughly the same time—or in legitimate response to one another—*Heck* would bar her lawsuit.

---

[11] "A guilty but mentally ill offender is no less guilty than one who is guilty and not mentally ill. Unlike an insanity verdict, a guilty but mentally ill finding or plea does not relieve an offender of criminal responsibility for his conduct." *Star v. Commonwealth*, 313 S.W.3d 30, 36 (Ky. 2010); KY. REV. STAT. ANN. § 504.130 (requiring proof of guilt beyond reasonable doubt).

For placing Curtis in substantial danger of serious death or injury would mean that, at that moment, Curtis could use deadly force"). Likewise, a conviction for resisting arrest generally bars civil litigation over arrest-force validity. *See id.* ("Generally speaking, for example, if an individual is convicted of resisting arrest, that conviction bars claims that the police used excessive force during an arrest. A victory in a damages suit thus would mean that the officer used force improperly, while the conviction for resisting arrest would dictate the opposite conclusion. That is a classic *Heck* problem." ( internal citations omitted)). Further, Kentucky law recognizes excessive force as a resisting arrest defense. *See Burke v. Forbis*, No. 3:18-CV-802-DJH-CHL, 2021 WL 2418574, at *3 (W.D. Ky. June 14, 2021); *see also Parvin v. Campbell*, 641 F. App'x 446, 450 (6th Cir. 2016) (recognizing same analysis under Tennessee law).

The Kentucky Supreme Court has stated that "the unlawfulness of an arrest may not be raised as a defense to a prosecution under this section . . . [*unless*] the officer used more force than is reasonably necessary to effect the arrest so that his conduct constitutes an assault on the person arrested." *Kavanaugh v. Commonwealth*, 427 S.W.3d 178, 181 (Ky. 2014) (internal quotation marks omitted) (alterations in original) (emphasis added) (quoting KY. REV. STAT. ANN. § 520.090). Because Hart could have raised excessive force as a defense, but did not, his claim— insofar as it relates to the particular time of arrest—is barred by his state guilty plea.

That said, "[w]hen the alleged excessive force is used after the suspect ceases resisting arrest, the *Heck* rule does not apply." *Swiecicki v. Delgado*, 463 F.3d 489, 494 (6th Cir. 2006). Similarly, in the wanton endangerment context, the sequence matters. Thus, conduct directly responsive to wanton endangerment would be subsumed within *Heck*, but a distinct force event would not. *See Phillips*, 765 F. App'x at 132 ("But Phillips says that she placed Curtis's life in jeopardy at point one, she ceased to be a threat at point two, and only after that did Curtis shoot

her. Under that scenario, assuming a material gap in time between the two events, her victory in this lawsuit would not necessarily invalidate her criminal conviction."). The precise chronology and sequence would resolve the timing and scope of preclusion. This matters much more for Lawson than for Bowling.

As to Bowling, Hart narrowly pins his claims only to the direct events of arrest and the post-arrest treatment. Thus, he complains that Bowling, in part, used excessive force in effecting Hart's arrest. Even without the plea details, though, the resisting arrest conviction would foreclose further inquiry into the force incident to arrest. *Heck* simply closes the door on that claim.

Further, even Hart's own expert conceded that Hart was resisting arrest on the ground, before being cuffed. *See* DE 122 at 60:25, 61:1-5. The Court sees no triable issue on the arrest itself. However, as noted, later-used force falls outside the *Heck* scope.

With the help of a civilian bystander, Bowling handcuffed Hart and placed him on the hood of Lawson's vehicle until the Kentucky State Police and an ambulance arrived. *See* DE 123-9 at 16:07:10-16:27:45. Bowling held Hart there for a period and then left the civilian, hands on, with Hart. Video reveals that during this twenty-minute period, Hart remained still, held bent over the hood face down, and with his hands behind his back. *See id.* That part of the event requires excessive force analysis, and because it is post-arrest, *Heck* does not conclude the inquiry.

Bowling argues that he is entitled to qualified immunity in his individual capacity. *See* DE 123-1 at 11-18. "When a free citizen claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, [courts] perform a Fourth Amendment inquiry into what was objectively 'reasonable' under the circumstances." *Coley v. Lucas Cty.*, 799 F.3d 530, 537 (6th Cir. 2015); *see also Tennessee v. Garner*, 105 S. Ct. 1694, 1699 (1985) (observing that "apprehension by the use of deadly force is a seizure subject to the reasonableness

requirement of the Fourth Amendment"). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 109 S. Ct. at1872. This inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. The Court's handling of the record must account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. In assessing those circumstances, the Court centrally considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

This overarching Fourth Amendment reasonableness inquiry folds into the qualified immunity framework. Qualified immunity shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow*, 102 S. Ct. at 2738. "A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Morrison v. Bd. Of Trs. Of Green Twp*., 583 F.3d 394, 401 (6th Cir. 2009). The Court may address the two prongs in any sequence. *See id.* "A right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (quoting *Morrison*, 583 F.3d at 400 (citation omitted)). That is, "existing precedent must have placed the statutory or

constitutional question beyond debate." *Id.* at 947-48. "After a defending officer initially raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity." *Id.* at 947.  At bottom, the doctrine "allows police officers breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation marks omitted).  However, as to this context, "qualified immunity is available only where officers make split-second decisions in the face of serious physical threats to themselves and others."  *Mullins v. Cyranek* 805 F.3d 760, 766–67 (6th Cir. 2015).

"It is well established in this circuit that the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional.  More specifically, we have held that use of a chemical spray on a suspect who is already handcuffed and no longer poses a threat to the safety of the officers or others constitutes excessive force." *Bultema v. Benzie Cnty.*, 15 F. App'x 28, 35 (6th Cir. 2005) (first citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988); then citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004), *cert. denied,* 544 U.S. 975, 125 S. Ct. 1837, 161 L.Ed.2d 725 (2005)).  Other cases have found triable issues involving post-arrest slapping and the repeated shoving of an arrestee's face toward the ground. *See Lucier v. City of Ecorse*, 601 F. App'x 372, 379-80 (6th Cir. 2015) ("Although a slap may cause less physical trauma than a shock from a taser, [g]ratuitous violence inflicted upon an incapacitated detainee constitutes an excessive use of force, even when the injuries suffered are not substantial. [U]nder specific circumstances, a slap may constitute a sufficiently obvious constitutional violation where a plaintiff is handcuffed and complying with officers' demands. In such cases, a slap to the face of a handcuffed suspect—even a verbally unruly suspect—is not a reasonable means of achieving anything more than perhaps further antagonizing or humiliating the

suspect.  (internal quotation marks omitted) (first quoting *Morrison*, 583 F.3d at 407; then quoting *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006)); *Morrison*, 583 F.3d at 408 ("She specifically claims Officer Celender repeatedly pushed her face to the ground every time she attempted to speak while she was already handcuffed, lying down, and compliant with the officer's commands. Given that we must assume on summary judgment that a reasonable officer would not have felt a threat to officer safety under the circumstances . . . Officer Celender's alleged behavior represents the sort of 'gratuitous violence' which we have found unconstitutional in *Pigram*. Such 'antagonizing' and 'humiliating' conduct is unreasonable under the Fourth Amendment, regardless of the existence of injury and crosses the line 'into physical abuse of an incapacitated suspect[.]'"  (internal citations omitted) (first quoting *Pigram*, 199 F. App'x at 513; then quoting *Bultema*,15 F. App'x at 37).  Consonant with these cases, Hart (viewing the record in his favor) was fully under control and yet placed in a painful and humiliating posture for over twenty minutes, all after Constable Bowling should have known he was confronting an intellectually compromised detainee.  Hart claimed that his head was slammed or shoved onto the hood.  *See* DE 117 at 28, 30-31.

Hart's excessive force claim against Bowling stems from two alleged incidents: (1) when Bowling struck Hart while he lay on the ground, and (2) when Bowling placed Hart against the hood of Lawson's cruiser.[12]  *See* DE 136 at 10, 18.  The second issue is triable.

---

[12] Hart also contends that Bowling is liable for *Lawson's* alleged excessive force.  *See* DE 136 at 20.  Though there is significant factual overlap, a failure to intervene claim is not synonymous with an excessive force claim.  A failure to intervene claim requires a showing that "the subject officer observed or had reason to know that excessive force would be or was being used and that the officer had both the opportunity and the means to prevent the harm from occurring." *Mills v. Owsley Cnty. Ky.*, 483 F. Supp. 435, 468 (E.D. Ky. 2020) (citing *Smith v. City of Troy*, 874 F.3d 938, 945-46 (6th Cir. 2017)). Hart does not raise a failure to intervene claim in the Complaint, *see* DE 1, and it is well-established that a non-moving party cannot raise claims for the first time in response to a motion for summary judgment.  *See Tucker v. Union of Needletrades, Ind. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005).

Once handcuffed, Bowling and the bystander folded Hart over Lawson's cruiser, where Hart remained for approximately twenty minutes.  *See* DE 123-9 at 16:06:25-16:27:45.  Bowling testified that he "recall[s] walking [Hart] over to the cruiser" but does not "recall pushing his head on it[.]"  DE 118 at 98:13-21.  In contrast, Hart alleges that Bowling "slammed" his face onto the cruiser's hot hood, which "burnt [his] face and "scorched his eyelids."  DE 117 at 66:1-13, 80:24-25, 81:1-2.  The Muddy Boy video plainly shows Bowling and the bystander walking a handcuffed Hart over to the cruiser and placing him face-first onto the hood.  *See* DE 123-9 at 16:06:25-16:07:10.  Bowling himself holds Hart fixed against the hood for roughly one minute; Bowling removes his hands from Hart's back, but the civilian remains in place and Bowling remains in the area.  *See id.* at 16:07:10.  Bowling told KSP, "We took him straight over to the cruiser and told the individual standing in front of the cruiser.  At that time, the Good Samaritan physically stood with, uh, what we'll now call, the prisoner . . . . [with] maybe a hand, maybe a hand on the handcuff, maybe a hand on the elbow."  DE 127-2 at 44 (KSP Supplementary Rep.).  What Bowling "told" the individual is not in the record, but Bowling held Hart there for a time and then, plausibly, left the civilian to hold Hart down on the car for the duration.

Interpreting Hart's version of events, in light of the record, the jury must assess Bowling's post-arrest conduct relative to Hart's clearly established constitutional right.  Despite what may have transpired leading up to the alleged excessive force, the key issue is that, *at the time of the incident*, "the 'amount of force that was used' must be roughly proportionate to the 'need for the application of force.'"  *Estate of Kulpa v. Cantea*, 708 F. App'x 846, 853 (6th Cir. 2017) (quoting *Cordell v. McKinney*, 759 F.3d 573, 581 (6th Cir. 2014) (internal quotation marks and citation omitted)).  A rational trier of fact could conclude that placing, allegedly slamming, a handcuffed Hart face-down on a black hood for twenty minutes, under the circumstances and in eighty-degree

weather, was an objectively unreasonable use of force.  *See Corbin, KY Weather History*, Weather Underground,  https://wunderground.com/history/daily/us/ky/corbin/KTYS/date/2019-7-24  (last visited Jan 16, 2024) (indicating that it was over eighty-degrees around 4:00 P.M. on July 24, 2019 in Corbin, Kentucky.

Hart's version (one supported by viewing the record in his favor and reviewing the video), shows that Bowling took the cuffed Hart to Lawson's cruiser, bent and held him over the hood (with Hart's pants at his feet) and left Hart chest down on the cruiser for the duration of the event. Bowling essentially put Hart in that status and, after a period, under the control of the civilian bystander.  For a period of over twenty minutes, Hart endured this posture and circumstance.  The period included the heat from the hood of a running black car in the July sun.  Per Bowling, "It was hot."  DE 118 at 65:4.  Hart relayed that his eyes were burned by having his face against the hood.  Bowling had described the scene euphemistically as a "100 degree" day.  *Id.* at  97:19-20. All of this for a man beaten into submission, cuffed, and diagnosed with Alzheimer's.  Whether Bowling and Lawson knew that mental status throughout is unclear, but there surely is proof both knew it by the time Bowling put Hart on the hood.  Dispatch had broadcasted Hart's status repeatedly, and Lawson was directly involved in one of the exchanges.  *See* DE 136-1 at 15:55:34 (Dispatch Transcript) (Lawson: "We've got a 10-15.  He's *destroyed my car*, shots fired.  Dispatch: . . . Be advised, this is an ATL for dementia patient.  ATL for dementia patient."); *id.* at 15:53:50 ("This is going to be a dementia patient.")

A jury might not view this conduct as objectively unreasonable, but it also might deem the force excessive.  Law enforcement that has an arrestee under control cannot, after that point, gratuitously apply force against the person.  In one viewing, Bowling, for no legitimate purpose or reason, put ("slammed") the injured, bleeding, and mentally compromised Hart in an awkward,

painful, and humiliating stance (again, pants down), for over twenty minutes.  The Court finds that a jury should assess the propriety of the Constable's post-arrest choices about the treatment of Hart.

### ii.   State Law Claims

Hart also brings claims under Kentucky state law for assault and negligent and intentional infliction of emotional distress ("IIED").  *See* DE 1 ¶¶ 42-43, 46-48.  Bowling briefly argues that these claims are precluded by qualified immunity.  *See* DE 123-1 at 18.  Hart's response unhelpfully focuses on his battery claim, *see* DE 136 at 24-25, which the Court dismissed in 2021, *see* DE 33 at 10.  Hart briefly addresses the assault claim and fails to comment on the negligence or IIED claim.  *See* DE 136 at 24-25.  The Court deems the claims as to Bowling waived and considers only the assault claim.[13]  *See Alexander v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018) ("When a plaintiff 'fails to address [a claim] in response to a motion for summary judgment,' the claim is deemed waived." (alteration in original) (quoting *Haddad v. Sec'y, U.S. Dept. of Homeland Sec.*, 610 F. App'x 567, 568-69 (6th Cir. 2015)).  Hart's assault claim alleges that "Bowling[] threatened Plaintiff with deadly force when he pointed a firearm at him at . . . Muddy Boy[.]"  DE 136 at 24.  In Kentucky, "[a]ssault is a tort which merely requires the threat of unwanted touching of the victim[.]"  *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001).

"[W]hen sued in their individual capacities, public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith

---

[13] The Court notes that Hart briefly addresses the intentional infliction of emotional distress claim in response to Deputy Lawson and Sheriff Shelley's motion for summary judgment, which he filed on the same day as his response to Constable Bowling's motion for summary judgment.  *See* DE 137 at 21.  Even if the Court were to consider the IIED claim, it is duplicative of the assault claim, warranting dismissal.  *See Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. Ct. App. 1993) ("[R]ecogniz[ing] that where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie.").

judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). In Kentucky, qualified immunity protects officers from liability for discretionary acts, taken in good faith, within the scope of their authority. *See id.* An act is discretionary if it requires the exercise of judgment or personal deliberation. *See id.* In contrast, qualified official immunity is not available "for the negligent performance of a ministerial act, *i.e.*, one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* "Bad faith can be demonstrated by objective unreasonableness or by a subjective intention to harm (i.e., a 'corrupt motive')." *Williams v. Sandel*, 433 F. App'x 353, 363 (6th Cir. 2011). The plaintiff bears the burden of proving that the act was not performed in good faith. *Id.*

Though the Kentucky qualified immunity analysis is slightly different than its federal counterpart, *see Coitrone v. Murray*, 642 F. App'x 517, 524 (6th Cir. 2016), the result here is the same. Bowling argues—and Hart does not dispute—that his conduct was discretionary. *See* DE 123-1 at 19. The Court agrees; it is well-established that the amount of force necessary to execute an arrest is discretionary. *See, e.g.*, *Nichols v. Bourbon Cnty. Sheriff's Dept.*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2016) ("The determination of the amount of force required to effect an arrest is a discretionary act and was within the scope of Graves' authority as a School Safety Officer."); *Almon v. Kilgore*, 3:19-CV-0006-GFVT, 2019 WL 1179387, at *4 (E.D. Ky. Mar. 13, 2019) ("Trooper Newberry did not pursue the motorcycle, but rather positioned his vehicle as a method of force by which to arrest the driver of the motorcycle. That use of force is a discretionary act."). Given that the assault claim is the persisting state law claim, and given that the wanton endangerment conviction (as to Bowling) and resisting arrest convictions would foreclose analysis of that aspect of the interaction, the assault claim must be dismissed. The assault theory could

only make sense relative to the firearm brandishing at Muddy Boy, and the record establishes that, at that time, Hart committed the wanton endangerment crime against Bowling, the only time the two directly interacted.  There is no triable issue on state law assault, in that context.  Battery, again, is long gone under Judge Hood's prior ruling.[14]

### d.  Deputy Lawson and Sheriff Shelley's Motion for Summary Judgment

Finally, Deputy Lawson and Sheriff Shelley seek summary judgment as to Hart's § 1983 and state law claims.  *See* DE 127; 127-1 (Memorandum in Support).  Defendants argue that: (1) Hart's federal and state claims based on excessive force allegations are precluded by his guilty plea; (2) there is no genuine issue as to the § 1983 and state law claims; (3) they are entitled to qualified and sovereign immunity; and (4) Hart presents no evidence supporting punitive damages. *See* DE 127-1 at 7-23.  Hart responded in opposition, *see* DE 137, and Defendants replied, *see* DE 142.

#### i.   Section 1983 Claim

Deputy Lawson and Sheriff Shelley first argue that Hart's excessive force claim is precluded by his state guilty pleas.  *See* DE 127 at 8-10.  Again, *Heck* bars a plaintiff from raising a § 1983 claim if "judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence[.]"  *Heck*, 114 S. Ct. at 2372.  As discussed with reference to Bowling, the *Heck* impact depends on the timing and sequence of the convicted conduct versus the complained of conduct under § 1983.  Lawson wants the Court to use *Heck* and the pleas to blot from civil purview the entirety of the day.  However, excessive force and *Heck* analysis require a segmented and conviction-specific approach.  *See Sawyer v. City of Soddy Daisy, Tenn.*, No. 22-5568, 2023 WL 1800270, at *2 (6th Cir. Feb. 7, 2023) ("And we must apply a segmented approach to the

---

[14] Plaintiff concedes on the negligence theories.

analysis[.]"); *Phillips*, 765 F. App'x at 132 (noting, per *Heck*, the need to assess the interrelationship between factual incidents when determining the preclusive impact of a conviction.).

The Court perceives the interactions at issue to be the McKeehan Road shooting (when Lawson shot out Hart's rear tire), the head-on interdiction coming the opposite direction (when Lawson tried to force a collision with Hart), the shooting at Muddy Boy (when Lawson tried to shoot out Hart's front tire), and Lawson's arrest of Hart. For the same reasons discussed as to Bowling, *Heck* closes the door on any claim by Hart bound up in the resisting arrest or wanton endangerment criminal convictions. Again, nothing in the record defines the factual bases with precision. Logically, resisting arrest involves the fact of or attempt to arrest, so that was the event at the end when officers finally secured and cuffed Hart, an inarguable arrest. The wanton endangerment also logically and evidently applies at Muddy Boy, when Hart twice hit Lawson's cruiser with Lawson standing nearby. Even Plaintiff expert Stidham agreed that wanton endangerment there occurred, justifying the arrest and facilitating force application.[15] DE 122 at 59:5-12.

However, the record does not support (at least, not to the point of directing summary judgment) that the wanton endangerment (a single charge, no less) encompasses the shootings or the attempted head-on collision initiated by Lawson. There are several reasons for this.

First, there were only two wanton endangerment counts, one involving Lawson, and one involving Bowling. The only time Hart was in one place with both was at Muddy Boy. Further, Stidham recognized the Muddy Boy interaction as the site of that crime. Given the lack of detail

---

[15] This takes off the table any striking of Hart by Lawson in removing him from the truck. That, and the conduct on the ground, is all part of and incident to the arrest and the wanton endangerment events, and *Heck* erases any civil claim as to those areas.

regarding the factual basis for the conviction, the record simply does not indicate that other interactions provided the basis for the Count 1 conviction.  Lawson cannot stand under the conviction umbrella for the full day's events.

Further, as to Hart's conduct at McKeehan Crossing—"disobedience of a police officer's order to stop and fleeing or eluding the police officer"—does not support a resisting arrest conviction.  *Johnson v. Commonwealth*, No. 2009-SC-656-MR, 2010 WL 4683559, at *6 (Ky. Nov. 18, 2010) ("Fleeing and evading requires the Commonwealth to prove that the person disregarded the direction to stop and fled.  Accordingly, resisting arrest requires an arrest, which is not an element of fleeing and evading. Conversely, fleeing and evading requires the disobedience of a police officer's order to stop and fleeing or eluding the police officer; neither element is required to sustain a conviction for resisting arrest.").

Although the post-collision force by Lawson falls under *Heck* (by virtue of the arrest and the immediately preceding wanton endangerment), even the shots fired at Muddy Boy remain in play.  The video, in the Court's viewing, indicates that Lawson fired at Hart's left side as he drove away from the initial Muddy Boy stopping place.  At that point, Hart was arguably trying to leave and no more.  *Heck* does not foreclose consideration of that act of shooting, which (arguably, at least) occurred prior to Hart's vehicle every making contact with or driving toward Lawson's prowler at Muddy Boy.  The Court **DENIES**, on specific terms, summary judgment on these grounds.

Lawson and Shelley also argue there is no genuine issue as to the § 1983 claim.  Hart sued both Lawson and Shelley[16] in their official capacities, and Lawson in his individual capacity.  *See*

---

[16] While Shelley was not physically present, a sheriff sued in his official capacity is "liable for the acts or omissions of deputies[.]"  *Gilley v. Prewitt*, No. 2020-CA-22-MR, 2022 WL 1194021, at *4 (Ky. Ct. App. Apr. 22, 2022); *see also* KY. REV. STAT. ANN. § 70.040 ("The sheriff shall be liable for the acts or omissions of his deputies.").

DE 1 ¶¶ 29-35.  "[I]ndividuals sued in their official capacities stand in the shoes of the entity they

represent."  *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003).  Thus, a claim against Lawson and

Shelley—employees of the Whitley County Sheriff's Department—is equivalent to a claim against

Whitley County.[17]  *Id.*; *see also Murphy v. Pike Cnty. Det. Ctr.*, 474 F. Supp. 3d 876, 886 (E.D. Ky.

2020) ("A § 1983 claim against a county official in his official capacity is properly treated as a

claim against the county itself.").

Counties "can be found liable under § 1983 only where the municipality *itself* causes the

constitutional violation at issue."  *City of Canton v. Harris*, 109 S. Ct. 1197, 1203 (1989).  To

establish liability, Hart must show that the alleged misconduct is a result of a policy, statement,

regulation, decision, or custom promulgated by Whitley County.  *See Monell v. Dep't of Soc. Servs.*,

98 S. Ct. 2018, 2037-38 (1978).  "A plaintiff can make a showing of an illegal policy or custom

by demonstrating one of the following: (1) the existence of an illegal official policy or legislative

enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the

existence of a policy of inadequate training or supervision; or (4) the existence of a custom of

tolerance or acquiescence of federal rights violations."  *Burgess v. Fisher*, 735 F.3d 462, 478 (6th

Cir. 2013).

Hart's response does not address the merits of the § 1983 official capacity claims.  *See* DE

137 at 12-21 (arguing only that the § 1983 claims are not barred under *Heck*).  Neither his response

brief nor his Complaint articulates an illegal policy or custom.  And it is not enough to rely solely

---

[17] Defendants incorrectly state that Hart's § 1983 claims should be construed as a claim against the Commonwealth of Kentucky.  *See* DE 127-1 at 10-13.  Defendants are Whitley County, not state, employees.  Accordingly, the Court rejects the argument that the federal claim is barred by sovereign immunity.  *See id.* at 12-13.  Sovereign immunity— which protects states and their instrumentalities from suit in federal court—does not extend to § 1983 claims against counties.  *See Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 97 S. Ct. 568, 572 (1977).  Although "Kentucky counties are 'cloaked with sovereign immunity' from state-law claims, they are exposed to liability under federal law."  *Smith v. Buckler*, No. 2:14-CV-51-DLB, 2016 WL 4132198, at *3 (E.D. Ky. Aug. 2, 2016) (quoting *Lexington-Fayette Urban Cty. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004)).  Accordingly, the § 1983 claim is not barred by sovereign immunity.

on the underlying interaction.  Even if a jury found that Lawson employed excessive force, that does not, in and of itself, establish Whitley County's liability.  *See Bright v. Gallia Cnty.*, 753 F.3d 639, 660 (6th Cir. 2014) ("A municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." (quoting *Monell*, 98 S. Ct. at 2036).  Indeed, Hart needs to demonstrate that Whitley County's "policy or custom *caused* that violation to happen."  *See id.* (emphasis added).  The record, construed in the light most favorable to Hart, plainly lacks evidence of this.  Thus, summary judgment on the § 1983 official capacity claims against Lawson and Shelley is appropriate.  [That said, the Court will keep Shelley in the case merely as a placeholder for application, should circumstances justify, of the Kentucky statute, § 70.040 and its derivative liability principles.]

As to the individual capacity claim, Lawson argues that he is entitled to qualified immunity.  As outlined earlier, qualified immunity shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known."  *Harlow*, 102 S. Ct. at 2738.  Again, the defendant bears the initial burden of demonstrating that he is entitled to qualified immunity.  *See Gardenhire*, 205 F.3d at 311.  Plaintiff does not contest Lawson's situational qualification, but does contest immunity application.  Plaintiff bears the burden on the ultimate question.

First, the force standards in play, for the Lawson-Hart interactions:

"When an officer uses deadly force," *i.e.*, force that creates a substantial risk of death or serious bodily harm, "the critical factor is whether the suspect presented an immediate danger to the officers or others."  *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020) (quoting *Mullins*, 805 F.3d at 766); *see also Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988) (stating that the

Supreme Court did not define "deadly force" in *Tennessee v. Garner* but noting that the Model

Penal Code drafted by the American Law Institute offered a helpful definition of deadly force as

"force which the actor uses with the purpose of causing or which he knows to create a substantial

risk of causing death or serious bodily harm" (citing MODEL PENAL CODE § 3.11(2))). "[A]n

officer's use of deadly force is only reasonable if []he had probable cause to believe that the suspect

pose[d] [such] a threat." *Id.* (quotation marks omitted). "In excessive force cases, the threat factor

is a minimum requirement for the use of deadly force, meaning deadly force may be used only if

the officer has probable cause to believe that the suspect poses a threat of severe physical harm."

*Mullins*, 805 F.3d at 766 (quotation marks omitted). "The fact that a situation unfolds quickly does

not, by itself, permit [officers] to use deadly force[.]" *Id*. (quotation marks omitted).

Force is deadly if it "create[s] a substantial risk of causing death or bodily harm. Purposely

firing a firearm in the direction of another person or at a vehicle in which a person is believed to

be constitutes deadly force." *Robinette*, 854 F.2d at 912 (quoting, as useful statement, MODEL

PENAL CODE § 3.11(2)).

The law regarding vehicle pursuits is well-established:

> The Sixth Circuit has developed "a consistent framework in assessing deadly-force claims involving vehicular flight." *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014). The "critical question" is whether the officer had objective " 'reason to believe that the [fleeing] car presents an imminent danger' to 'officers and members of the public in the area.' " *Id.* (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)). Deadly force is justified against "a driver who objectively appears ready to drive into an officer or bystander with his car," but generally not "once the car moves away, leaving the officer and bystanders in a position of safety," unless "the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car." *Id.* (citations omitted). The Sixth Circuit has found deadly force justified by prior interactions demonstrating continuing dangerousness only when the "suspect demonstrated multiple times that he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around." *Cupp*, 430 F.3d at 775 (characterizing the suspects in both *Scott v. Clay Cty.*, 205 F.3d 867, 872 (6th Cir. 2000), and *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)).

To determine whether Latits presented an imminent danger to officers or the public at the time Officer Phillips shot him requires analysis of both the moments before the shots were fired and the prior interactions between Latits and Phillips. Just before the shots, the videos show that Latits reversed past Phillips before Phillips raised his gun and before gunshots can be heard. In *Hermiz v. City of Southfield* we stated that: "A reasonable jury drawing inferences in the estate's favor could determine that an officer that aimed and fired shots while to the side of the vehicle," after "the hood of [the suspect's] car already passed the point where it could harm [the officer]," "would have had time to realize that he was no longer in the path of the car and no longer in immediate danger." 484 Fed.Appx. 13, 16 (6th Cir. 2012). Likewise, because Officer Phillips fired after Latits's car had passed the point where it could harm him, Phillips had time to realize he was no longer in immediate danger.

*Latits v. Phillips*, 878 F.3d 541, 548 (6th Cir. 2017). *Latits v. Phillips*, decided in 2017, signals that all uses of deadly force, as presented in this case, present triable issues under the Fourth Amendment.

There are disputed fact issues of consequence as to each segment of deadly force.

Lawson states that he approached Hart at the McKeehan Crossing Road, and issued "verbal and visual commands" to put his vehicle in park, but Hart instead "turned his wheels toward [Lawson], revved his engine[.]"  DE 119 at 27:9-13, 62:16-20.  At this point, Lawson claims that he "was concerned about getting hit" and thus drew his gun.  *See id.* at 28:2-7.  Hart began to drive away, and Lawson shot at Hart's left rear tire to disable the truck.  *See id.* at 30:19-23, 32:18-20. Although Lawson's deposition claims he was "just trying to keep from getting hit" by Hart's vehicle, *see id.* at 32:18-19, Lawson's original statement to KSP arguably indicates that Hart merely hurried away, *not* that Hart turned the truck toward or endangered Lawson, *see generally* DE 135-3 (KSP Interview Transcript).  Thus, Lawson said Hart was "power braking" with his "foot on the gas."  *Id.* at 2.  Lawson stepped away and pulled his weapon, giving commands to put the vehicle in park:  "Um, the vehicle then just, . . . sped away, tried to speed away at a high rate of speed." He shot "the left rear tire" after the "driver had passed, and I was looking at the left rear tire and

35

so the only thought that I could think was to disable the vehicle." *Id.* Lawson certainly claims, subjectively, he was in fear for his life. Plaintiff expert Stidham flatly refuted the notion of danger, from the objective circumstances: "There's absolutely no way he was in any danger at [the position described in the KSP statement.]" DE 122 at 53:6-7. Deadly force justification hinges on a reasonable officer's perception, and a jury could, in one reasonable view of the facts, deem Lawson not to have been in objective peril as the truck passed and Lawson merely faced the rear tire as Hart sped off. This is precisely where *Latits v. Phillips* comparably deemed a fact question to exist, an officer shooting after the danger had ceased.

Lawson, driving his cruiser, followed Hart. *See* DE 119 at 34:1-5. Eventually, Lawson saw Hart "coming the opposite direction that [he] was going" and Lawson "swerve[d] over into [Hart's] lane of traffic in an attempt to disable" the vehicle. *Id.* at 34:15-25. Lawson was going 25 mph and had no estimate on Hart's speed. *See id.* at 35:1-6. Lawson intentionally endeavored to cause Hart to stop by, as one option, "a collision." *Id.*, at 34:23-25. Hart instead turned left and down a different road. *See id.* at 35:7-8. Had Hart's conduct up to that point justified the use of Lawson's vehicle to catalyze a head-on crash? Again, there are issues for jury evaluation. While other observations of danger surely matter under *Latits v. Phillips*, the record here is uneven. Thus, both Bowling and Lawson describe Hart as having driven and passed recklessly between the restaurant and the McKeehan Road stop. *See, e.g.*, DE 119 at 18:8-9, 21 (Lawson, claiming to have seen Hart pass a line of stopped cars: "there was about a half a mile of vehicles stopped and he just passed them. . . . He passed dozens of vehicles."); 118 at 21:20-25 (Bowling, claiming Hart "was on the wrong side of the road, crossing the yellow line, passing other vehicles, . . . creating a dangerous situation . . . forcing people . . . off the roadway"). Bowling, however, had followed Hart the entire time. He claimed to have passed no one himself. *See* DE 118 at 22:16-18. At the

36

stop scene, Bowling testified he was only 3-5 cars behind Hart. *See id.* at 23:12-17. To the KSP, Bowling suggested he was stopped *directly* behind Hart. *See* DE 127-2 at 33 ("I put a couple truck lengths behind this guy .  .  . in a stopped line of traffic."). These versions do not square. Importantly, when Lawson approached Hart at McKeehan Crossing, he did not believe he had probable cause or the power to arrest him at that point. *See* DE 119 at 21:9-10. This undercuts the suggestion that Lawson had seen Hart drive recklessly in advance of Hart refusing to obey Lawson's commands. The use of the vehicle, forcing Hart to confront a direct collision, is for the jury to assess. Hart was continuing to try to evade a stop, but that, itself, clearly is not a warrant for the use of deadly force.

Hart continued driving, ultimately stopping at Muddy Boy. *See id.* at 35:14-15, 36:9:21. Lawson exited his cruiser, with his weapon drawn toward Hart. *See id.* at 37:9-20. Hart "cut a big donut" and "t-bone[d]" Lawson's cruiser. *Id.* at 27:24, 38:7-10. Indeed, the video shows that Hart's truck twice struck the cruiser. Lawson testified that he shot again at Hart as Hart drove toward and threatened contact with the cruiser: "As he was going past, or you know – fixing to hit my vehicle, I fired rounds into his left front tire." *Id.* at 38:20-22. If that sequence is accurate, Lawson will have no liability for such use of force. However, the video and other matters in the record, suggest that Lawson instead fired at Hart as Hart was driving away (or, plausibly, trying to) at Muddy Boy. This was Stidham's take: "the video itself . . . shows that as Mr. Hart accelerated out the very first time that's when the shooting was done by Mr. Lawson . . . not when Mr. Lawson was coming at the . . . vehicle because the shooting was over." DE 122 at 38:12-17.

Without question, the scene was intense, compressed, and chaotic. However, viewing the facts in Hart's favor, a jury could determine that Hart (as he arguably did at McKeehan and as he did when avoiding the head-on collision) was trying to drive away from Lawson and his cruiser at

initiation of the Muddy Boy confrontation.  Hart pulls out, and Lawson arguably then fires multiple shots into the truck, after which the donuts and collisions occur.  This sequence, should the jury accept it, again may run afoul of the Fourth Amendment.  Further, Stidham, as to the cruiser twice being hit, blamed not Hart's intentional driving but the destabilizing effect of the flattened rear tire, a consequence of Lawson's shots.  *See id.* at 107:20-25; DE 72-1 at 93 (noting tire marks and effect of flattened left rear tire).  The jury must sort these disputed issues.

Accepting Hart's version of the interactions as true, a trier of fact could reasonably conclude that a constitutional violation occurred as to one or all of the deadly force uses.  *See Graham*, 109 S. Ct. at 1872.  Per the *Graham* factors, Hart's originating crime—failing to pay for an under $10 meal—was minor.  While Hart cannot recall the McKeehan Crossing interaction, he offers evidence supporting that he presented no threat and that Lawson's reaction was unjustified.  His proffered expert, Stidham, impugns the reasonableness of Lawson's decision to shoot at Hart's tires.  *See* DE 122 at 77:7-20 ("[Lawson] used deadly force to stop someone what had not committed a felony at that point.").  Stidham opines that, at that point, "[t]here's absolutely no way [that Lawson] was in any danger at that position . . . .of being struck by [Hart's] truck. *Id.* at 53:6-7.  Stidham is also critical of Lawson's decision to swerve into Hart's lane of travel.  While Stidham conceded that Lawson would be justified in blocking a roadway, he noted that a "vehicle is a deadly weapon" and "going head on at somebody with the intention of ramming them" is "not justified" under these facts.  *Id.* at 89:24-25, 90:1-14.  Concerning the encounter at Muddy Boy, as the Court discussed thoroughly above, Hart advances evidence that he, when confronted, again was trying to drive away when Lawson fired a fusillade at the truck.  Viewing these questions in Hart's favor, as the Court must on a motion for summary judgment, precludes qualified immunity.

ii.     *State Law Claims*

Lawson and Shelley argue that the official capacity state law claims are barred by sovereign immunity.[18]  *See* DE 127-1 at 12-13.  Individuals sued in their official capacities are "cloaked with the same immunity as the government or agency he/she represents."  *Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 169 (Ky. 2003) (citing *Yanero*, 65 S.W.3d at 522).  "County governments in Kentucky are cloaked in sovereign immunity, unless such immunity is expressly waived."  *Doe v. Patton*, 381 F. Supp. 2d 595, 602 (E.D. Ky. 2005) (citing *Schwindel*, 113 S.W.3d at 163).  Hart has not introduced evidence of waiver by either Defendant, except for the statutory theory as to imputed liability of the Sheriff, under § 70.040.  Other than that exception, which the Court will reserve in the event the Deputy is found liable, state law claims against Shelley and Lawson, both employees of Whitley County, are thus barred under sovereign immunity.

---

[18] Defendants argue, with minimal development, that Hart's state law claims for assault, battery,  negligence, and IIED are barred under the doctrine of res judicata.  *See* DE 127-1 at 9-10.  The Sixth Circuit has explained:

> Res judicata generally includes two separate concepts - claim preclusion and issue preclusion. Claim preclusion, or true res judicata, refers to [the] effect of a prior judgment in foreclosing a subsequent claim that has never been litigated, because of a determination that it should have been advanced in an earlier action. Issue preclusion, on the other hand, refers to the foreclosure of an issue previously litigated.

*Mitchell v. Chapman*, 343 F.3d 811, 818 n.5 (6th Cir. 2003) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ*., 104 S. Ct. 89, 894 n.1 (1984)).  Here, Defendants seek application of claim preclusion.  "Under Kentucky law, res judicata, or claim preclusion, 'may be used to preclude entire claims that were brought or should have been brought in a prior action, while the doctrine of collateral estoppel [or issue preclusion] only applies to issues actually litigated.'" *Donovan v. Thames*, 105 F.3d 291, 295 (6th Cir.1997) (quoting *City of Covington v. Bd. of Trs. of Policemen's and Firefighters' Retirement Fund*, 903 S.W.2d 517, 521 (Ky.1995)).  Claim preclusion consists of three elements: "(1) there must be an identity of parties between the two actions; (2) there must be an identity of the two causes of action; and (3) the prior action must have been decided on the merits."  *Miller v. Admin. Office of Courts*, 361 S.W.3d 867, 872 (Ky. 2011) (citing *Harrod v. Irvine*, 283 S.W.3d 246, 250 (Ky. Ct. App. 2011)).

Though Defendants, without elaboration, posit this argument as separate from the *Heck* determination, the Court sees no daylight, at least in this case.  As with the § 1983 theories, the Court will deem the convictions to block liability for the conduct actually adjudicated by the pleas; the force events exceed the convicted conduct, so the Court will not, at summary judgment, treat all state claims as precluded by the extant convictions.

Finally, Lawson argues that the individual capacity state law claims are barred by state qualified immunity. *See* DE 127-1 at 18-19. The state law claims turn on contested events from McKeehan Crossing through Muddy Boy. *See* DE 1 ¶¶ 42-43, 46-47. "[W]hen sued in their individual capacities, public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero*, 65 S.W.3d at 522. Qualified immunity protects officers from liability for discretionary acts, taken in good faith, within the scope of their authority.[19] *See id.* It is well-established that the amount of force necessary to conduct an arrest is discretionary. *See, e.g.*, *Nichols*, 26 F. Supp. 3d at 642.

For the same reasons the Court finds triable issues under § 1983, the Court also finds triable issues under most of the state theories. The pro-Hart versions would put Lawson's employment, thrice, of deadly force clearly outside the permission of Kentucky law. *See* KY. REV. STAT. ANN. § 503.090(2) (requiring underlying felony and belief that person "likely to endanger human life unless apprehended without delay"). Indeed, if the jury found the force unwarranted under federal standards, it could and likely would make a consonant decision under state law. As such, state qualified immunity does not preclude the state claims. *Cf. Haugh v. City of Louisville*, 242 S.W.3d 683, 687 (Ky. Ct. App. 2007) (affirming circuit court's determination that peace officer was entitled to qualified immunity, noting that "the objective reasonableness of the decision to bring the standoff to a quick conclusion is compelling considering: (1) that two hours of attempted negotiations had failed to persuade Hines to surrender; (2) that Hines was armed with a deadly weapon; and (3) that one of the outstanding charges against Hines was for assaulting a police

---

[19] While there is an exception or employees performing ministerial duties, *see Yanero*, 65 S.W.3d at 524, as discussed above, decisions surrounding use of force are discretionary.

40

officer").  Viewing the facts in the light most favorable to Hart, Lawson is not entitled to state qualified immunity.

That said, the Court pares the claims based on the record.  First, Hart concedes that the negligence claims must fall.  *See* DE 137 at 25.  For now, and subject to the proof and theories applicable at trial, the Court will keep both the assault and battery claims against Lawson.  Lawson (based on the *Heck* analysis) does not face liability for the force applications after the second vehicle collision—this includes removal of Hart from the truck and the ultimate arrest.  The Court does not perceive Lawson as having direct involvement in Hart's placement or retention on the cruiser hood.  As such, any IIED claim would be duplicative of the residual assault and battery torts.  *Rigazio*, 853 S.W.2d at 299 ("[R]ecogniz[ing] that where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie").

### iii.  Punitive Damages

Finally, the Court considers Hart's punitive damages request.

Punitive damages are available for § 1983 individual-capacity claims "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 103 S. Ct. 1625, 1640 (1983).  "If the plaintiff proves sufficiently serious misconduct on the defendant's part, the question whether to award punitive damages is left to the jury, which may or may not make such an award."  *Id.* at 1638.  "[D]eterrence of future egregious conduct is a primary purpose of both § 1983 . . . and of punitive damages."  *Id.* at 1636 (internal citation omitted).  As extensively discussed, Hart offers evidence that Lawson employed excessive force against Hart.  This could

41

support a finding of reckless or callous indifference.  The reckless or callous indifference standard is subjective and requires evidence that Lawson acted "in the face of a perceived risk that [his] actions [would] violate federal law." *Kolstad v. Am. Dental Ass'n*, 119 S. Ct. 2118, 2125 (1999).  If a jury accepts Hart's version of the facts, it would be permitted to consider a punitive damages award.  Summary judgment is not appropriate.

For similar reasons, the Court will not dismiss the punitive damages request concerning the state law claims.  In Kentucky, punitive damages are permitted when a plaintiff proves "by clear and convincing evidence that the defendant from whom such damages are sought acted towards the plaintiff with oppression, fraud, or malice."[20] KY. REV. STAT. ANN. § 411.184(2).  "It is a rule of longstanding in this Commonwealth that exemplary or punitive damages may be recovered in an assault and battery case . . . where the assault is willful, malicious and without justification." *Banks*, 39 S.W.3d at 481.  "[C]lear and convincing evidence is 'evidence substantially more persuasive than a preponderance of evidence but not beyond a reasonable doubt.'" *Mahaney ex rel. Kyle v. Novartis Pharms. Corp.*, No. 1:06-CV-00035-R, 2011 WL 4103669, at *3 (W.D. Ky. Sept. 14, 2011) (quoting *Fitch v. Burns,* 782 S.W.2d 618, 622 (Ky.1999)).  As with the underlying conduct issues, the jury must assess the propriety of Lawson's conduct and, if it finds contrary to Lawson, determine the damages.

## III.   Conclusion

For the above reasons, the Court **ORDERS** as follows:

1.  The Court **GRANTS** DE 113, Nurse Bowling and SHP's motion for summary judgment;

2.  The Court **GRANTS** DE 115, Jailer Lawson's motion for summary judgment;

---

[20] However, in *Williams v. Wilson*, the Kentucky Supreme Court found the "malice" requirement unconstitutional. *See Williams,* 972 S.W.2d at 268-69.

3. The Court **GRANTS in part and DENIES in part** DE 123, Constable Bowling's motion for summary judgment; and

4. The Court **GRANTS in part** and **DENIES in part** DE 127, Deputy Lawson and Sheriff Shelley's motion for summary judgment, all as outlined above.

This the 23rd day of January, 2024.

**Signed By:**

**_Robert E. Wier_**

**United States District Judge**